UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIE A. TORRENCE,

                    Petitioner,

        v.

ROBERT NEUSCHMID,

                    Respondent.

Case No.  19-cv-05214-SI

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS**

# INTRODUCTION

Willie Torrence filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his murder conviction.  The court issued an order to show cause why the writ should not be granted.  For the reasons discussed below, the petition will be DENIED.

# BACKGROUND

The California Court of Appeal described the evidence presented at trial.

On August 8, 2011, Cynthia was sitting in her car in front of a grocery store on International Boulevard near 64th Avenue in Oakland.  A three-year-old boy was being pushed in his stroller by his mother.  Cynthia saw a car that looked like a "Neon" driving by at approximately 15 to 20 miles per hour, about one car length in front her.  She saw a dreadlocked, dark-skinned African–American man reaching an arm with a gun out of the passenger's window of the Neon.  She heard about 10 gunshots.  Cynthia then heard the boy's mother shouting that her son had been shot.

Cynthia got out and saw two African–American men lying on the ground with gunshot wounds.  She picked up and tried to aid the young victim, but he died before the ambulance arrived.  Cynthia identified the Neon in photographs taken from a nearby surveillance camera.

The two adult victims were Jerome Williams and Robert Hudson.  Williams testified that he left Oakland to avoid testifying and had been arrested for failure to appear as a witness in the case.  Williams explained that for the last 14 or 15 years there had been a feud between some people in the "65th Avenue Village" and the "69th Avenue

United States District Court
Northern District of California

Village" housing projects.  He and Hudson had both lived in the 65th Village for 15 to 20 years.  Williams has "65" tattooed on his arm.  He was afraid to testify and be labeled a "snitch."  Testifying in front of people he knew from the 69th Village made him feel "funny" and "intimidated."

Williams testified that on August 8, 2011, around 1:00 p.m., he and Hudson were standing on International Boulevard between 64th and 65th Avenues.  He saw a gray car pass by on the far side of the street, heading towards 64th Avenue.  The driver was "mugging" or "looking hard" at him.  He recognized the driver as Torrence.  People called him "Whoa" or "Little Will."  As the car passed, he said "there goes those 69th cats."  After the car made a U-turn in front of the market and came back, Williams heard gunshots.  He was hit in the head and shoulder and fell to the ground.  Later, at the hospital, Williams identified Torrence as the driver and picked his photograph from a photo lineup.  He also identified a photograph of the car Torrence was driving.  Williams did not see the shooter.

Robert Hudson testified that he was currently in custody based on his failure to appear to testify.  He was not happy to be testifying.  He acknowledged having been arrested a number of times for selling drugs near the location of the shooting.  He initially acknowledged the existence of a feud between 65th Village and 69th Village and testified that "a lot of people" had been shot because of the feud, but he later claimed not to know of such a feud.  On the day of the shooting, Hudson was "hanging out" on International Boulevard with Williams.  He saw Williams get a scared look and heard Williams say "There goes those 6–9 cats."  He turned around, saw a gun and got down.  As he hid behind a car he heard more than five shots.  At trial, Hudson could not identify the shooter.  When asked whether he remembered identifying [codefendant] Denard from a photographic line-up while in the hospital, Hudson said that he could not.  He also denied making a follow-up statement to the police in which he again identified Denard or "Laylow" as the shooter.

Oakland Police Sergeant Steven Nowak testified that he spoke to Robert Hudson at the hospital.  Hudson was in critical condition and was strapped to a gurney with a tube in his mouth at the time of the interview.  Hudson nodded when Sergeant Nowak asked if he could hear him.  When asked if he could identify the people involved, Hudson nodded "yes."  When told he would show him pictures of people who may or may not be involved, Hudson again nodded "yes."  Hudson looked at all of the photos and, when asked if he recognized anyone, again nodded "yes."  When asked if the person he recognized was one of the shooters, he nodded yes.  The sergeant pointed to photo number one, and Hudson shook his head "no."  When the sergeant pointed to photo number two, which was Denard, Hudson nodded his head "yes."  When the sergeant pointed to photo number 3, Hudson again nodded his head "no."  Sergeant Nowak moved back to photo number 2, and again Hudson nodded his head "yes."  The sergeant asked if Hudson was identifying the shooter and Hudson nodded "yes," and made the number "2" with his hand "by closing his ring finger pinky and thumb."

At trial, Hudson claimed that he identified Denard in the photo lineup because that was the person he saw on the news.  He acknowledged that around Denard's picture in the lineup there was a circle and his initials, but stated he did not put them there.

Hudson was also shown a video tape of an interview conducted at the district attorney's office during which he identified Denard as the shooter.  In the video, Hudson states that he saw "Laylow" in the window of the car "whipping out the gun."  Laylow's real name was Lawrence.  He was half way hanging out of the window.  Laylow was a "dark skin dude with dreads."

2

Hudson testified that the tape had been "doctored." He denied that he ever told the police in the interview he knew "Laylow" and testified that he only heard that name from Williams after he left the hospital. Hudson denied that he said on the video tape that he saw "Laylow" with the gun, and he did not tell the police that Laylow's first name was Lawrence. He did not tell the police that Laylow was hanging out the window of the car or that he got a good look at Laylow firing the gun. He did not tell the police that Laylow had dark skin and shoulder-length dreadlocks.

Hudson testified that "Shawn" came to help him immediately after he had been shot. DeShawn was arrested on the night of the shootings for possession of a firearm and gave a statement the next day. Later, he gave a videotaped interview. Both times he identified Denard as the shooter. At trial, he disavowed his earlier statements. DeShawn did not want to testify at trial. He had been transported from out of state pursuant to a warrant to compel him to testify.

Oakland Police Officer Michael Igualdo testified that a month before the shooting he stopped a 2004 gray Dodge Neon near 62nd Avenue. Torrence was driving but the car was registered to his girlfriend Desiree.

Desiree testified that she owned the Dodge Neon in which Torrence had been stopped earlier in the year. She testified that around 9:00 a.m. on August 8, Torrence dropped her at work in San Jose and left in her Neon. That afternoon, around 2:30 p.m., Torrence called and said he was on his way back to San Jose to return the car.

Video surveillance footage of the area, from two local business establishments, showed the suspect vehicle heading West on International Boulevard, then making a U-turn and coming back Eastbound on International Boulevard.

Denard was arrested at home on August 9, 2011, and Torrence was arrested three days later. Their cell phones were seized at the time of their arrests. An Alameda County District Attorney Inspector testified as an expert on cell phone information and cell phone tower data. He testified that defendants' cell phone data placed them in the vicinity of International Boulevard around the time of the shooting. He also opined that the two phones were "in close proximity of each other during that time period."

Text messages were also recovered, including the following exchange between Torrence's phone and another phone on the night of August 9: Torrence: "they on me ... you see the news?" Responder: "What, from the Vil?" Torrence: "Yeah." Responder: "Whoa ..., what you gonna do. I kind knew it was you, but I really didn't know. Did you do the little boy?" Torrence: "Don't talk like that through these texts. You trippin?" Responder: "I just go far away." Torrence: "And keep your mouth closed. Don't tell nobody nothing, please."

Five videos that were taken from Denard's cell phone were played to the jury. In the videos, Denard expressly claims an association with 69th Village. He also displays handguns, talks of drug dealing, shows scenes of drugs, and talks of shooting rival gang members.

Letters to and from defendants while they were in jail were admitted into evidence. The letters expressly identify Williams or Hudson as the witnesses who identified defendants and threatened retaliation. Torrence repeatedly signs his letters "Whoa" and writes "God forgives, Whoa don't." Copies of Torrence's "writings" while in jail were also introduced into evidence. In one, he states "65 ain't Tha Vill" and "street code names never revealed." In another, Torrence claims to be "from SNV (sixty-ninth village)" and writes of sending people "to the dirt." He also wrote, "If

3

you ever hear Whoa did it, then it got to be right, because nine times out of ten, ima take your life."

Oakland Police Lieutenant Tony Jones testified as an expert on Oakland gangs and gang culture.  He testified that there were two gangs within the housing project that runs from 65th Avenue to 69th Avenue, and he described the history of the ongoing feud between the 69th Village and 65th Village gangs.  He detailed their turf and testified that the shooting took place in 65th Village's turf.  He testified that the primary activities of the 69th Village gang include murder, drug dealing, robberies, and possession of guns.

Photographs of defendants' tattoos were introduced, including Torrence's tattoos which read "Bannon Boys" and "Whoa" and Denard's tattoos which include the numbers "6" and "9."  Images recovered from Torrence's social media accounts were also admitted.  In one, Torrence can be seen wearing a T-shirt that reads "revenge is a promise, Pooka."  Other images show [Torrence] and Denard "flashing" hand signals associated with the 69th Village gang.  Jones explained that Pooka was a 69th Village member who was killed.  He also explained the significance of the tattoos to the gang.  Jones opined, based in part on their tattoos, material seized from their phones and social media accounts, and statements made to the police, that Denard and Torrence are members of the 69th Village gang.  Jones also discussed a number of prior gang-related crimes in which defendants were involved.  Jones also opined, based on their tattoos and the location of their prior drug sales, that Williams, Hudson and DeShawn were members of the 65th Village gang.  Given a hypothetical question that assumed numerous facts for which there was evidence, including a daytime drive-by shooting, and "mean-mugging," Jones concluded that such a killing would be gang related.  He explained that the crime would serve to enhance the gang's reputation for violence.

*People v. Torrence*, No. A142592, 2018 WL 1376741, at *1–4 (Cal. Ct. App. Mar. 19, 2018).

The jury found Torrence guilty of first-degree murder, first-degree attempted murder, shooting from a motor vehicle, and possession of a firearm by a felon.  The jury also found firearm, gang, and prior prison term enhancements true as to each defendant.  Torrence was sentenced to a total of 121 years to life in prison.[1]

Torrence appealed.  The California Court of Appeal affirmed his conviction and denied his petition for writ of habeas corpus.  The California Supreme Court granted the petition for review and transferred the matter back to the court of appeal with directions to vacate its decision and reconsider the case in light of California Senate Bill No. 620, which amended the California Penal Code to permit trial courts to strike certain firearm enhancements in the interest of justice.  The California Court of Appeal remanded to the trial court, which declined to strike any of Torrence's

---

[1] Torrence's codefendant, Lawrence Denard was convicted of the same crimes and had the same sentence-enhancement allegations found true.  Denard was sentenced to a total of 137 years to life in prison.  Denard's conviction was upheld on appeal.

firearm enhancements and reaffirmed the original sentence.  On August 15, 2019, the California Court of Appeal affirmed the sentence.  On October 23, 2019, the California Supreme Court denied Torrence's petition for review.

Torrence then filed his federal petition for writ of habeas corpus. The court ordered respondent to show cause why the petition should not be granted.  Respondent filed an answer. Torrence did not file a traverse, and the deadline by which to do so has passed.  The matter is now ready for decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the] Court has on a set of materially indistinguishable

facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id*. at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id*. at 102.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**DISCUSSION**

A.  <u>Confrontation Clause Claim Based On Admission of Gang Expert's Testimony</u>

Torrence received a longer prison term under a statute that provides for certain sentence enhancements for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b).  Torrence claims that some of the gang expert's testimony offered in connection with this charge violated his rights under the Sixth Amendment's Confrontation Clause because it was testimonial hearsay that was prejudicial to his case.[2]  He argues that the error tainted both the gang enhancements and the convictions.  *See* Docket No. 1-1 at 41.

1.  <u>State Court Proceedings</u>

Oakland police lieutenant Jones testified at trial as an expert about gangs and gang culture. He testified that he was aware of the 65th Village gang and the 69th Village gang, which had started as a single group but split into two gangs in 2001 after a particular killing.  According to lieutenant Jones, there were killings back and forth between the two gangs almost on a weekly basis and the retaliatory shootings continued into 2011.  In addition to this sort of general information about the gangs, lieutenant Jones testified about two matters that form the basis for the Confrontation Clause claim: (a) other police contacts with Torrence and Denard, and (b) a hypothetical that was quite similar to the facts of this case.

a.  <u>Codefendants' Other Contacts With Police</u>

Lieutenant Jones testified about a 2004 armed robbery committed by Torrence, Denard, and two other alleged gang members, robbing a Hispanic man who was selling corn out of a cart on the street.  According to Jones, Torrence pointed a gun at the vendor's chest and robbed him; the four

_____

[2] As with many of his claims, Torrence's argument about the gang expert's testimony focuses on state law issues rather than federal constitutional issues.  Because state law errors cannot support federal habeas relief, this court examines only the federal constitutional issues.

assailants then ran into a house, where they were arrested and guns were seized.  Jones testified that Torrence told investigators that he was carrying the gun he possessed during the robbery because he was having problems with a particular member of the 65th Village gang.  RT 2374-75.  Lieutenant Jones also recounted other arrests:  Torrence was arrested in 2007 for unlawful possession of a firearm, RT 2372-76; Denard was arrested in 2004 for possession of a loaded sawed-off shotgun that he had tucked into his pants, RT 2365-67; and Denard was arrested in 2009 for being a felon in possession of a firearm, RT 2377-78.  Lieutenant Jones also testified to various circumstances that led him to believe that these crimes were gang-related.

Torrence urged on appeal (as here) that lieutenant Jones' testimony about "past police contacts including arrests" of Torrence and Denard was testimonial hearsay because there was no evidence that Jones' testimony was based on anything other than reading existing police reports. Docket No. 1-1 at 35; Docket No. 20-3 at 13-14.

The California Court of Appeal rejected Torrence's claim that his Confrontation Clause rights were violated by the limited testimonial hearsay from lieutenant Jones about police contacts with Denard and Torrence to prove their intent to benefit the gang when committing the underlying crimes as well as to prove their present gang membership.  *People v. Torrence*, 2018 WL 1376741, at *15.  The appellate court concluded that any error did not prejudice Torrence.

> Even assuming that the evidence objected to by defendants was improperly admitted, the other evidence that defendants were active members of the 69th Village gang and that the crimes were committed for the benefit of the gang was so overwhelming that the failure to exclude this evidence was harmless beyond a reasonable doubt.
>
> Here, Jones's background information on the 69th Village and 65th Village gangs, including turf and history, was confirmed by the victims' testimony.  The victims' membership in the 65th Village gang is established by William's tattoos and by the fact that the victims were selling drugs in 65th Village turf, which Jones permissibly opined would not be allowed if they were not associated with that gang.  Denard's tattoos and the videos on his phone overwhelmingly establish that he was an active member of the 69th Village gang and that the shooting was committed in association with the gang for the purpose of retaliation against or intimidation of the 65th Village gang.  Likewise, Torrence's tattoos, the photograph of him in a T-shirt promising revenge for the death of a 69th Village gang member, his social media posts and his writings in prison all establish his active participation in the 69th Village gang and that the crime was committed with the requisite intent.  There is no likelihood that defendants would not have been convicted had the testimonial hearsay been excluded.

*Id.*

8

b.  <u>Answer to Hypothetical Question</u>

Lieutenant Jones was asked and agreed with the hypothetical that, "[i]f two gang members are going to slide through an area to commit a violent crime, one driving, the other one being a passenger," the driver who is a gang member will know what the passenger who is a gang member is going to do.  RT 2402-03.  Lieutenant Jones testified that the driver and passenger "are essentially in it together" and both "know what they are doing together.  They know why they are doing it, what the purpose of it is for," and the driver would know if the passenger has a gun.   RT 2402-03.  According to Torrence, this hypothetical was posed to lieutenant Jones immediately after the jury was shown two cell phone videos in which Denard held a gun and used the phrase "sliding through" an area.  Docket No. 1-1 at 36.

Torrence urged on appeal (as here) that lieutenant Jones' opinion that a gang-member driver would know that his gang-member passenger had a gun and planned to use it was testimonial hearsay.

The California Court of Appeal rejected the challenge to the admission of lieutenant Jones' testimony that the driver would know that the passenger had a gun and planned to use it if two gang members "slide through" an area.  The appellate court determined that the admission of that evidence was harmless, if it was error to admit it, although the appellate court discussed whether the evidence was fundamentally unfair rather than whether it violated the codefendants' Confrontation Clause rights.  The appellate court explained:

> Torrence's identity as the driver was also convincingly established by William[s'] identification immediately after the shooting and at trial, and by the fact that at the time of the crimes he was in possession of the car used in the crimes.  Likewise, although he disputed his knowledge and intent at trial, the evidence provided a strong basis to conclude that he was aware of and actively supported Denard's shooting. The testimony was clear that Torrence stared at Williams as he drove past, then made a U-turn and drove slowly past the victims as Denard was firing the gun.  The erroneous admission of some gang evidence did not deprive defendants of a fair trial.

*People v. Torrence*, 2018 WL 1376741, at *15.

2.  Analysis

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*, 541 U.S. at 50–51.  Statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, 547 U.S. 813, 822 (2006)," and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)."  *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (citing *Ohio v. Clark*, 576 U.S. 237, 243-44 (2015)).

Although the Supreme Court and the Ninth Circuit have not elaborated at length on Confrontation Clause issues with regard to testifying expert witnesses post-*Crawford,* the Ninth Circuit has explained that other "circuits have sketched the broad contours of the doctrine":

> An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.  Allowing a witness simply to parrot "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion" would provide an end run around *Crawford. United States v. Lombardozzi,* 491 F.3d 61, 72 (2d Cir. 2007). For this reason, an expert's use of testimonial hearsay is a matter of degree.  The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay.  As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem.  The expert's opinion will be an original product that can be tested through cross-examination.

*United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013).

If there is a Confrontation Clause error, federal habeas relief is not available unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

United States District Court
Northern District of California

(1946)). When, as here, the state court has found that any error was harmless, relief is not available for the error "unless the *harmlessness determination itself* was unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (emphasis in original). In other words, a federal court may grant relief only if the state court's harmlessness determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 269-70 (quoting *Harrington v. Richter*, 562 U.S. at 103).

The California Court of Appeal's determination that any assumed error in allowing lieutenant Jones to testify about Torrence's other contacts with the police to show his gang connections was harmless error was not contrary to or an unreasonable application of clearly established federal law. As the California Court of Appeal observed, the evidence that Torrence was an active member of the 69th Village gang and that the crimes were committed for the benefit of the gang was "overwhelming." *People v. Torrence*, 2018 WL 1376741, at *15. Setting aside lieutenant Jones' testimony about the previous arrests of Torrence and Denard, there was a lot of evidence that showed that Torrence was an active member in the 69th Village gang and that the shooting was committed in association with the gang for the purpose of retaliation against or intimidation of the 65th Village gang.

The evidence established various points that created a web that ensnared Torrence on both the gang enhancement and the substantive offenses. Evidence that showed Torrence's membership in the 69th Village gang included his tattoos that mentioned "Bannon Boys" (a subset of the 69th Village gang) and "Whoa" (his gang moniker); a photograph of him wearing a T-shirt promising revenge for the death of a 69th Village gang member; his writings from jail that threatened retaliation to victims Williams and Hudson, who were in the rival gang; Torrence's writing from jail that suggested that he was responsible for one or more killings; and a photo of Torrence and Denard flashing hand signals associated with the 69th Village gang. Evidence that connected Torrence to the shooting included the evidence that the shooting emanated from a Dodge Neon car that Torrence borrowed from his girlfriend on the day of the shooting; Williams' identification of Torrence as the driver of the car; cell phone data that put Torrence's cell phone near the vicinity of the shooting at the relevant time; Torrence's text messages indicating consciousness of guilt (as his text indicated

he was involved in the incident and then his follow-up text told the recipient to stop sending texts that mentioned the detail of the death of the child); and Torrence's writing from jail that appears to claim credit for a killing.  Evidence that showed Denard's membership in the 69th Village gang included videos from his cell phone showing him claiming an association with the 69th Village, showed him displaying guns, and showed him talking about shooting rival gang members.  Evidence that connected Torrence to Denard, and both of them to the crime, included evidence that they were both in the 69th Village gang; data from both their cell phones that put them in close proximity to each other and in the vicinity of the shooting; and Hudson's identification of Denard as the shooter, which connected Torrence to the crime because Torrence was identified as the driver by Williams. Evidence that suggested that Torrence was aware of, and actively supported Denard in, the shooting (rather than being an unknowing driver of a car from which a passenger unexpectedly started shooting at people on the sidewalk) included the evidence that Torrence drove past the gang-victims and stared at them before making a U-turn and driving slowly past them again as about ten shots were fired by Denard, who was hanging out of the window of the car; both Torrence and Denard were in the 69th Village gang; the shooting victims included two persons associated with a rival gang with whom the 69th Village gang was in a long-running feud; and evidence that one gang-victim acknowledged to the other that Torrence was in a rival gang ("there goes those 69 cats") as Torrence first drove past them.  These various pieces of evidence provided plenty of evidence to allow a jury to conclude that Torrence was a member of the 69th Village gang and took part in a shooting for the "benefit of, at the direction of, or in association with" the 69th Village gang "with the specific intent to promote, further, or assist" the shooting by Denard.  Cal. Penal Code § 186.22(b).  These various pieces of evidence also provided strong support for the determination that he was liable for the murder and attempted murders on an aiding and abetting theory.  Regardless of lieutenant Jones' testimony about the earlier police contacts with Torrence and Denard, this evidence would lead the jury to the same conclusions about the gang-enhancement allegation and the substantive offenses.

The relatively brief jury deliberations provide further support for a finding that the Confrontation Clause error was harmless.  "'Longer jury deliberations weigh against a finding of

1    harmless error because lengthy deliberations suggest a difficult case.'"  *United States v. Lopez*, 500

2    F.3d 840, 846 (9th Cir. 2007) (quoting *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th

3    Cir. 2001); *see, e.g., Carter v. Davis*, 946 F.3d 489, 512 (9th Cir. 2019) (length of deliberations was

4    not a persuasive sign that the jury struggled with the verdict where deliberations of 3.5 to 4 days

5    followed a multiple-week trial, and jury had over a dozen issues - including three murders, two

6    rapes, two residential burglaries, and concurrent issues - to decide); *Lopez*, 500 F.3d at 846 (2.5-

7    hour jury deliberations in illegal reentry case suggested any error in allowing testimony or

8    commentary on defendant's post-arrest silence was harmless); *Velarde-Gomez*, 269 F.3d at 1036 (4-

9    day jury deliberations in a two-count drug case supported inference that impermissible evidence

10   affected deliberations).  Here, the jury reached a verdict after deliberating for less than six hours

11   following a 29-day trial that involved multiple charges and enhancement allegations for each of the

12   two defendants.  *See* CT 1881, 1895.  The short jury deliberation relative to the length of the trial

13   indicates that the jury did not have difficulty in coming to a consensus and supports the conclusion

14   that the admission of the challenged evidence was harmless error, if it was error.

15       Based on the strength of the prosecution's case, including the other evidence that showed

16   the gang membership of the codefendants and the gang nature of the crime, as well as the relatively

17   short jury deliberations, the court concludes that the California Court of Appeal's rejection of the

18   Confrontation Clause claim on harmless error grounds was not contrary to or an unreasonable

19   application of clearly established federal law as set forth by the United States Supreme Court.

20   Torrence is not entitled to habeas relief on this Confrontation Clause claim.

21       The second area of evidence challenged has a different analysis.  The admission of evidence

22   based on the hypothetical question posed to lieutenant Jones – that a gang-member driver would

23   know his gang-member passenger had a gun and planned to use it -- did not result in a Confrontation

24   Clause violation because the evidence was not testimonial hearsay.  Torrence urges that, because it

25   was not based on personal knowledge, this testimony was testimonial hearsay.  Docket No. 1-1 at

26   37.  He errs in presuming that any testimony made without personal knowledge is testimonial

27   hearsay.  He does not show that lieutenant Jones' answer to the hypothetical question relayed any

28   statement that "result[ed] from questioning, 'the primary purpose of [which was] to establish or

United States District Court
Northern District of California

prove past events potentially relevant to later criminal prosecution,' . . . or any written statement that was "'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial." *Lucero*, 902 F.3d at 989 (quoting *Davis*, 547 U.S. at 822).   With regard to the hypothetical posed to him, lieutenant Jones did not act "'as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.'"  *Gomez*, 725 F.3d at 1129 (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).   There was no *Crawford* problem with respect to this part of lieutenant Jones' testimony.  If it is nontestimonial, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011); *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (under *Crawford*, the Confrontation Clause has no application to nontestimonial statements and therefore does not bar their admission).  The California Court of Appeal's silent rejection of this Confrontation Clause claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court.  In any event, even if the admission of the hypothetical question amounted to a Confrontation Clause violation, the error would have been harmless for the reasons stated three paragraphs above, i.e., the various pieces of other evidence provided a firm basis for the jury to conclude that Torrence was in a gang, committed the crimes for the benefit of/in connection with the gang, and was liable for the murder and attempted murders.

B.  Admission of Videos from Denard's Cell Phone

Videos obtained from Denard's cell phone were admitted into evidence at trial.  In the videos, Denard and others are "displaying firearms and can be heard repeatedly using offensive language, including racial and homophobic slurs and demeaning statements about women.  Torrence is not visible in any of the videos although it is possible he is referenced by name in the video made several months prior to the shooting." *People v. Torrence*, 2018 WL 1376741, at *11.  Torrence urges that the admission of this evidence amounted to a *Bruton* error in violation of his Confrontation Clause rights and amounted to a due process violation.

United States District Court
Northern District of California

### 1.  Confrontation Clause Claim

The case of *Bruton v. United States*, 391 U.S. 123 (1968), contains a specialized rule that provides Confrontation Clause protection against the admission of a "facially incriminating confession of a nontestifying codefendant" at a joint trial, "even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987).  The *Bruton* rule provides no help to Torrence because it only applies to testimonial statements, as the Ninth Circuit held in *Lucero*, 902 F.3d at 987-88.  "[T]he *Bruton* limitation on the introduction of codefendants' out-of-court statements is necessarily subject to *Crawford*'s holding that the Confrontation Clause is concerned only with testimonial out-of-court statements." *Lucero*, 902 F.3d at 987-88.  The boastful and threatening videos on the cell phone were made for Denard and for friends (and perhaps enemies); those videos certainly were not meant to "establish or prove past events potentially relevant to later criminal prosecution" or to serve as the functional equivalent of live in-court testimony. *See Lucero*, 902 F.3d at 989 (defining testimonial statements).  Because Denard's statements on the videos on his cell phone were nontestimonial, the *Bruton* rule does not apply to those statements.  The California Court of Appeal correctly held that no Confrontation Clause violation occurred in the admission of this evidence that did not include testimonial hearsay.

### 2.  Due Process Claim

Torrence next argues that the admission of those same videos from Denard's cell phone violated his right to due process.  He contends that, if the videos were not excluded, the trial court should have severed the trials of the codefendants or given a limiting instruction that the videos applied only to Denard.

Torrence's arguments were rejected by the California Court of Appeal.  The appellate court's discussion did not discuss the due process claim and instead discussed state law issues, especially the balancing of probative value against undue prejudice that is required by California Evidence Code section 352.

> Contrary to Torrence's argument, we see no basis to disagree with the court's finding that the videos were not unduly prejudicial. As the Attorney General notes, the videos had probative value in the case against Torrence. "[T]he evidence was probative on

the nature of the 69th Avenue Village gang. Both appellants repeatedly attempted to show that the 69th Avenue Village was merely a geographic location, which the residents viewed with pride. They tried to explain their tattoos, and the statements they made in writing and in pictures and videos, as merely showing local loyalty. Denard's videos plainly showed that the 69th Avenue Village was a gang which engaged in drug sales, and violent retribution and expansion of territory. These facts were a strong indication of motive. The reason Denard and Torrence shot the victims in this case was to expand their drug selling territory, and to eliminate drug selling rivals. Denard proclaimed these motives vividly in the videos." The trial court reasonably concluded that this probative value was not outweighed by any purported prejudice. The court did not see the "passing references to inappropriate treatment and attitudes towards women, or attitudes reflecting disdain for persons of a different sexual persuasion or a similar type, rise to the level of undue prejudice which will so inflame this jury, crying out for emotional response and hatred from the jurors, that they will no longer follow the instructions of the court and they can no longer be fair and impartial to the defendants." Given the clear probative value of the videos and the trial court's reasonable estimate of the potential prejudice, we find no error in the admission of the evidence and agree with the trial court that separate trials were not warranted.

*People v. Torrence*, 2018 WL 1376741, at *12.

The California Court of Appeal also rejected the alternative argument that, if any of the other claims were waived by a failure to adequately request an instruction, then counsel was ineffective for not requesting an instruction. *Id.* Any such failure to request an instruction was harmless because "much of the evidence was admissible against Torrence," and "to the extent that any part of the video might have been subject to a limiting instruction, given the overwhelming evidence of Torrence's participation in the crimes, there is no likelihood that the absence of a limiting instruction impacted the verdict in any way." *Id.*

The standards for federal due process claims based on failures to sever trials, give limiting instructions, and exclude evidence are at least very similar: the failure must render the trial fundamentally unfair. A refusal to sever trials of codefendants does not amount to a due process violation unless it rendered the trial that did occur "fundamentally unfair." *See Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997) (denial of severance can prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process). A state trial court's refusal to give a limiting instruction does not amount to a due process violation unless the erroneous omission of a jury instruction "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citation omitted). To violate due process, the allegedly wrongful admission of evidence must be "so extremely unfair that its admission

violates 'fundamental conceptions of justice.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)).  Even when constitutional error is found in any of these three areas, federal habeas relief is available only if the error had a substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 623.

Here, the California Court of Appeal's silent rejection of the due process claim was not contrary to, or an unreasonable application of clearly established federal law.  Whether characterized as a failure to sever the trials, failure to issue an instruction limiting the evidence only to Denard, or a failure to exclude the evidence, Torrence's claim fails because the admission of the evidence did not render his trial fundamentally unfair.  The California Court of Appeal determined that Denard's cell phone videos did have probative value in the case against Torrence (as well as their obvious probative value against Denard).  The videos tended to support a finding that there was a 69th Village gang and that "69th Village" was not simply a geographical or housing area name.  This was relevant to the gang-enhancement allegation against Torrence, as that allegation required the prosecutor to prove, among other things, that there was a gang that met the definition of a criminal street gang.[3]  Proving that a group is a gang often will involve evidence that may suggest violence or menacing behavior, but that is the nature of criminal street gangs and does not compel the exclusion of the evidence.  Although there apparently were homophobic and misogynistic comments made on the videos, it is unreasonable to think that a juror would latch on to those comments rather than the violent and menacing messages in the same videos to make a decision as to whether Denard and Torrence were in a street gang and committed their crimes in connection with the street gang.  It was not unreasonable for the California Court of Appeal to conclude that the admission of this evidence did not make Torrence's trial fundamentally unfair.  He is not entitled to the writ on this due process claim.

---

[3] The jury instruction on the criminal street gang enhancement provided, in part, that the jury had to decide whether each defendant committed each crime "for the benefit of, at the direction of, or in association with a criminal street gang," and that the defendant "intended to assist, further, or promote criminal conduct by gang members."  Docket No. 16-6 at 225 (CT 958).  A criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal: [1.] That has a common name or common identifying sign or symbol; [2.] That has, as one or more of its primary activities, the commission of the Listed Offenses described below."  *Id.*  The "Listed Offenses" include murder and attempted murder.

United States District Court
Northern District of California

United States District Court
Northern District of California

C. <u>Admission of Evidence of Prior Acts of Domestic Violence</u>

1. <u>State Court Proceedings</u>

During the prosecution's case-in-chief, Torrence's girlfriend, Desiree Trailor, testified about Torrence borrowing her car, including on the day of the shootings.  Although Torrence's counsel did not cross-examine her, Denard's counsel did briefly cross-examine her.   On redirect examination, the prosecutor questioned Trailor about prior instances of domestic violence against her by Torrence.  Torrence contends that the admission of this evidence of his past acts of domestic violence violated his right to due process.

The California Court of Appeal discussed the trial court proceedings and concluded that the domestic-violence evidence was properly admitted under state law for impeachment purposes.

> In Desiree's rebuttal testimony, the prosecutor questioned her about prior instances in which Torrence had committed domestic violence against her.  Desiree admitted that on November 10, 2010, Torrence grabbed her by the neck and threw her onto a couch.  She was asked about a statement she signed in November stating that Torrence punched her and that both sides of her face and her eyes were swollen.  She testified she did not recall the incident.  She also denied that she wrote or signed a statement indicating that she did not report him because she was scared and did not want to be the reason that he goes to jail.  Finally, she was questioned about an incident on May 12, 2011, in which she and Torrence argued when she told him he could not use the Neon and he hit her with a closed right hand.  She admitted the argument, but denied that Torrence hit her.

> In seeking to admit the evidence, the prosecutor noted that Desiree seemed to be withholding information that she knew about the crimes and Torrence's friends and his "lifestyle."  The prosecutor asked that the evidence be admitted as impeachment to explain why Desiree might be reluctant to say more to the jury and to show that she was testifying as Torrence had told her to.  [Footnote omitted.]  The court admitted the evidence with the following limiting instruction: "I am allowing [evidence] for a limited purpose.  The limited purpose is, it is not received for the truth of the matter referred to.  It is only admitted for this limited purpose, that is, whatever effect it has, if any, on the state of mind of this witness as the witness is testifying. . . .  [¶] . . . At the end of the case, I will remind you of evidence that was admitted for a limited purpose, and you are to consider it only for that limited purpose."  The trial court reiterated the instruction in the closing instructions.

> Torrence contends the domestic violence evidence was not properly admitted as impeachment because Desiree's "state of mind was not relevant.  She was not evasive and her testimony was very favorable to the prosecution and unfavorable to [him]."  He argues further that the evidence was unduly prejudicial.  Whether Desiree's testimony was sufficiently evasive to place her mental state at issue and support admission of this evidence is a question soundly within the trial court's discretion.  (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 887.)  We cannot say on this record that the court abused its discretion in so finding.  Nor do we find the evidence unduly prejudicial.  Finally, given the overwhelming evidence of Torrence's guilt, any

1    potential error in the admission of this evidence is harmless.  (*People v. Watson*, supra, 46 Cal.2d at p. 836.)

2    *People v. Torrence*, 2018 WL 1376741, at *13.

3    Although the state appellate court did not discuss the federal constitutional claim which had

4    been presented to it, the decision is presumed to be a rejection of the federal constitutional claim on

5    the merits.  *See Harrington*, 562 U.S. at 99.  Thus, this court "must determine what arguments or

6    theories supported or . . . could have supported, the state court's decision; and then it must ask

7    whether it is possible fairminded jurists could disagree that those arguments or theories are

8    inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Id.* at 102.

9

10       2.   <u>Analysis</u>

11    The United States Supreme Court has never held that the introduction of propensity or other

12    allegedly prejudicial evidence violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 68-70

13    (1991); *id*. at 75 n.5 ("we express no opinion on whether a state law would violate the Due Process

14    Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged

15    crime").

16    In *Estelle v. McGuire*, the defendant was on trial for murder of his infant daughter, after she

17    was brought to a hospital and died from numerous injuries suggestive of recent child abuse.

18    Defendant told police the injuries were accidental.  Evidence was admitted at trial that the coroner

19    discovered during the autopsy older partially healed injuries that had occurred six to seven weeks

20    before the child's death.  *Id.* at 65.  Evidence of the older injuries was introduced to prove "battered

21    child syndrome," which "exists when a child has sustained repeated and/or serious injuries by

22    nonaccidental means."  *Id.* at 66.  The state appellate court had held that the proof of prior injuries

23    tending to establish battered child syndrome was proper under California law.  *Id.*  In federal habeas

24    proceedings, the Ninth Circuit found a due process violation based in part on its determination that

25    the evidence was improperly admitted under state law.  *Id.* at 66-67.  The U.S. Supreme Court first

26    held that the Ninth Circuit had erred in inquiring whether the evidence was properly admitted under

27    state law because "'federal habeas corpus relief does not lie for errors of state law.'"  *Id.* at 67.  The

28    Supreme Court then explained:

United States District Court
Northern District of California

19

The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point. [¶] Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial. We hold that McGuire's due process rights were not violated by the admission of the evidence. *See Spencer v. Texas*, 385 U.S. 554, 563-564, 87 S. Ct. 648, 653-654, 17 L.Ed.2d 606 (1967) ("Cases in this Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial. . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure").

*Estelle v. McGuire*, 502 U.S. at 70 (omission in original).

The cited case, *Spencer v. Texas*, 385 U.S. at 563, held that the admission of evidence of prior convictions did not violate due process. The Supreme Court explained in *Spencer* that, although there may have been other, perhaps better, ways to adjudicate the existence of prior convictions (e.g., a separate trial on the priors after the trial on the current substantive offense resulted in a guilty verdict), Texas' use of prior crimes evidence in a "one-stage recidivist trial" did not violate due process. *Id.* at 563-64. "In the face of the legitimate state purpose and the long-standing and widespread use that attend the procedure under attack here, we find it impossible to say that because of the possibility of some collateral prejudice the Texas procedure is rendered unconstitutional under the Due Process Clause as it has been interpreted and applied in our past cases." *Id.* at 564.

*Estelle v. McGuire* also cited to *Lisenba v. California*, 314 U.S. 219, 228 (1941), in support of the conclusion that the introduction of the battered child syndrome evidence did not so infuse the trial with unfairness as to deny due process of law. *See Estelle v. McGuire*, 502 U.S. at 75. In *Lisenba*, the Supreme Court rejected a claim that the admission of inflammatory evidence violated the defendant's due process rights. The evidence at issue in *Lisenba* was live rattlesnakes and testimony about them to show they had been used by the defendant to murder his wife. The Court explained that it did not review questions of the propriety of state law evidence decisions by the judge. "We cannot hold, as petitioner urges, that the introduction and identification of the snakes so infused the trial with unfairness as to deny due process of law. The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason

alone, render its reception a violation of due process." *Lisenba*, 314 U.S. at 228-29.

These three Supreme Court cases declined to hold that the admission of prejudicial or propensity evidence violates the defendant's due process rights. No Supreme Court cases since *Estelle v. McGuire* have undermined the holdings in these three cases. In other words, there is no Supreme Court holding that the admission of prejudicial or propensity evidence violates due process.

The Supreme Court has established a general principle of "fundamental fairness," i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process. *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (due process was not violated by admission of evidence to identify perpetrator and link him to another perpetrator even though the evidence also was related to crime of which defendant had been acquitted)). Thus, the court may consider whether the evidence was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Id.*

The admission of prejudicial evidence may make a trial fundamentally unfair and violate due process "[o]nly if there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions." *Id.* The admission of evidence will violate due process only if there are no permissible inferences the jury may draw from the evidence and the evidence is "'of such quality as necessarily prevents a fair trial.'" *Jammal*, 926 F.2d at 920.

Here, the California Court of Appeal reasonably could have determined that Torrence did not show that the admission of evidence about prior episodes of domestic violence by him met the very demanding standard of being so extremely unfair that its admission violates fundamental conceptions of justice. Torrence's prior acts of domestic violence against his testifying girlfriend provided an explanation for his girlfriend's reluctance to testify against him, and it was never argued that they showed he had a bad character. The California Court of Appeal reasonably could have determined that there were several permissible inferences that the jury could have drawn from the

United States District Court
Northern District of California

United States District Court
Northern District of California

evidence, although those inferences were not of great probative value as to Torrence's guilt.  The jury could have inferred both that Trailor was untruthful in her testimony and was untruthful due to her fear of further violence from Torrence.  A lot of Trailor's testimony was of the "I don't recall" and "I didn't see anything" sort; having learned that Trailor had been subjected to domestic violence by Torrence – and having learned that he was tape-recorded in a jail in Las Vegas telling Trailor to "say what I told you" – the jury could have drawn the inference that she was not truthful in her responses and that she knew incriminating details that she declined to disclose pursuant to Torrence's command due to her fear of him.  For example, the jury could have disbelieved Trailor's testimony – as being the product of fear due to Torrence's past violence against her -- that, when he returned the car on Monday evening just hours after the shooting, Torrence did not explain why he was returning the car four days early, she did not see anyone with him, she did not see another car, and she did not know how he planned to get from the car drop-off in San Jose back to his home in the Oakland area. RT 1454-58.  As another example, the jury could have disbelieved Trailor's testimony that Torrence did not say why he went to Las Vegas a few days after the shooting.  RT 1461-63.  And, of course, the jury could have used the domestic violence evidence to draw the inference that Trailor was fearful of Torrence and that was why she was not being truthful when she testified that Torrence had not pressured her as to what to say to the police.  RT 1467.  These inferences were not highly probative of Torrence's guilt, but the law does not require that the inferences be highly probative; the inferences that may be drawn from the evidence need only be permissible.  *See Jammal*, 926 F.2d at 920.  The California Court of Appeal reasonably could have concluded that this evidence cleared that low bar.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  Bearing in mind the extremely general nature of the Supreme Court's articulation of a principle of "fundamental fairness" – i.e., evidence that "is so extremely unfair that its admission violates 'fundamental conceptions of justice'" may violate due process, *Dowling*, 493 U.S. at 352 – the California Court of Appeal's rejection of Torrence's due process claim was not contrary to or an unreasonable

application of clearly established federal law as set forth by the Supreme Court. *See generally Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (denying writ because, although Supreme Court "has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ") (internal citation omitted).

Even if the admission of the domestic-violence evidence amounted to constitutional error, that error was harmless. The domestic-violence evidence was limited and concerned a collateral point – i.e., the credibility of a witness who was not at the shooting and whose testimony pertained to acts and statements of Torrence that might have suggested consciousness of guilt (e.g., the circumstances surrounding the return of the car hours after the shooting, the circumstances of Torrence's move to Las Vegas days after the shooting, and whether Torrence had instructed the witness not to divulge information to the police). As explained in the preceding section A.2, the evidence of Torrence's guilt was strong. The strength of that evidence, apart from the erroneously admitted evidence, properly is considered when assessing whether there was actual prejudice under *Brecht*. *See Sims v. Brown*, 425 F.3d 560, 570-71 (9th Cir. 2005). Moreover, the domestic-violence evidence was preceded by a limiting instruction, so the jury was aware that it could only consider the evidence for "whatever effect it has, if any, on the state of mind of this witness as this witness is testifying." RT 1476; *see also* RT 3234. Torrence has not provided any reason to depart from the normal presumption that jurors follow the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). And, as explained in section A.2, above, the short jury deliberations indicate that the jury did not struggle with this case and support a finding of harmlessness. Torrence has not shown that the admission of evidence of his prior acts of domestic violence against the testifying witness "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (citation omitted). He is not entitled to the writ on this claim.

### D. Admission of Torrence's Statements Made to Jail Personnel

When Torrence was interviewed at the Alameda County Jail for purposes of determining his housing as he was being booked into the jail on another offense several months before the drive-by shooting, Torrence stated that he was "69th Village" and his subset was "Bannon Boys." That information, along with a description of his tattoos, was documented on jail intake forms.

On appeal, he contended that the admission of this evidence violated his Fifth Amendment right to remain silent and was improper under *People v. Elizalde*, 61 Cal. 4th 523 (2015), which held that the Fifth Amendment prohibited admission of gang-related statements made by defendants in jail intake interviews.  (*Elizalde* was issued after Torrence's trial.)  The Attorney General conceded the error.  The Court of Appeal determined that the assumed error was harmless because the same information was solidly established by other evidence.  "Torrence's gang membership is established beyond question by the admissible portions of the gang expert's testimony, the photographs of his tattoos, his social media account and his jailhouse writings in which he claimed membership in the 69th Village gang." *People v. Torrence*, 2018 WL 1376741, at *16.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966), requires that a suspect be given certain warnings and must waive those warnings before he may be subjected to a custodial interrogation. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.* at 479; *see also Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (referring to the "*Miranda* exclusionary rule").  There is an exception to the *Miranda* rule for routine questions asked when a person is booked into jail and jailers are attempting "to secure the biographical data necessary to complete booking or pretrial services," *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (quotation marks omitted), but that exception does not apply when the police "'should have known that a question was reasonably likely to elicit an incriminating response.'" *United States v. Williams*, 842 F.3d 1143, 1146–48 (9th Cir. 2016) (citation omitted).  Answering a question about gang affiliation is reasonably likely to be incriminating to a California detainee charged with murder or another violent crime because "gang membership exposes a defendant to 'a comprehensive scheme of [state] penal statutes aimed at eradicating criminal activity by street gangs." *Id.* (quoting *Elizalde*, 61 Cal.th at

538).

The admission of evidence obtained in violation of *Miranda* is subject to a harmless error analysis. Federal habeas relief is not available unless the admission of the evidence "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (citation omitted). When, as here, the state court has found that any error was harmless, relief is not available for the error "unless the *harmlessness determination itself* was unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (emphasis in original).

In a *Brecht* analysis of an improperly admitted confession, the question "is not whether the properly admitted evidence would have been sufficient; it is whether the improper evidence [e.g., the improperly admitted confession] had a substantial and injurious effect or influence on the jury." *Garcia v. Long*, 808 F.3d 771, 783 (9th Cir. 2015); *see, e.g., id.* at 781-84 (admission of statements obtained in violation of *Miranda* was not harmless where victim's testimony of repeated sexual molestations was uncorroborated by physical evidence, the victim's grandmother's testified that defendant apologized for hurting the child but did not specify the ways he had hurt her, defense counsel conceded guilt on some charges only because the admission of the interrogation tape left him no other choice, and the confession was the focal point of prosecutor's closing argument); *Hurd v. Terhune*, 619 F.3d 1080, 1088, 1091 (9th Cir. 2010) (granting habeas relief where prosecution made extensive comments during opening statement and closing argument on petitioner's post-*Miranda* refusal to reenact the shooting of his wife during police interrogation, after petitioner had invoked his right to remain silent, as evidence of guilt, in violation of petitioner's *Miranda* rights, and the court could not say that the evidence did not substantially influence the jury); *Arnold v. Runnels*, 421 F.3d 859, 869 (9th Cir. 2005) (granting habeas relief where the prosecutor specifically emphasized in his opening statement and closing argument the petitioner's invocation of silence, which had been admitted at trial in violation of *Miranda*, and the court could not say that the evidence had no substantial influence upon the jury). The fact that the statements obtained in violation of *Miranda* might not have been a full confession sufficient to prove guilt does not necessarily mean that their admission was harmless error. *See Garcia*, 808 F.3d at 782-83 (improperly admitted statements were not harmless error because they were the focal point of the

prosecutor's argument, including extensive argument that the statements showed him flip-flopping on key points).

The California Court of Appeal's determination that the assumed error in admitting evidence that Torrence had identified himself as a member of the 69th Village gang was harmless was not contrary to or an unreasonable application of clearly established federal law. As the California Court of Appeal noted, the evidence that Torrence was an active member of the 69th Village gang was solidly established by other evidence. Gang expert lieutenant Jones opined that Torrence was a gang member based on Torrence's tattoos and Facebook posting showing him wearing a gang-related t-shirt. And Torrence's writings from jail in which he claimed membership in the 69th Village gang provided even more evidence that he was in the 69th Village gang. With or without the information that Torrence self-identified as a member of the 69th Village gang when he was booked into the jail, the jury would have reached the same conclusion that he was a member of that gang. The fact that the jury deliberated for mere hours after a 29-day trial further supports the conclusion that the jury did not struggle with the gang membership issue. Torrence is not entitled to the writ on this claim.

E. Refusal to Instruct on Accessory-After-the-Fact Liability

Torrence contends that the trial court's refusal to give a jury instruction on accessory-after-the-fact liability violated his right to due process. He urges that such an instruction was necessary because the jury could have found that, while he may have driven the car from which the shots were fired, "he did not know beforehand that his passenger had a gun and was going to shoot it but, after the shooting had taken place, he was aware of it and continued to drive, thereby enabling the shooter to flee from the scene." Docket No. 1-1 at 59.

The California Court of Appeal rejected the claim that the trial court had erred in refusing the requested jury instruction. The appellate court explained that such an instruction was not allowed under state law because the prosecutor had not agreed to the instruction. Because being an accessory-after-the-fact "would be a lesser related offense to the offense charged, and not a lesser included offense, . . . giving the instruction would have been 'proper only upon the mutual assent of

the parties.'" *People v. Torrence*, 2018 WL 1376741, at *16 (quoting *People v. Rangel*, 62 Cal.4th 1192, 1230 (Cal. 2016)).[4]  The California Court of Appeal further found that any state law error in not giving the accessory-after-the-fact instruction was harmless because Torrence was found guilty of first degree murder and two counts of malicious discharge of a firearm from a motor vehicle under an aiding and abetting theory – convictions that required the jury to find beyond a reasonable doubt that Torrence knew, or should have known, that his passenger possessed a firearm and intended to discharge it into a crowd.  *Id.*

Although instructions on lesser-included offenses must be given in capital cases, *Beck v. Alabama*, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether *Beck* applies to noncapital cases such as the present one.  In fact, this circuit, without specifically addressing the issue of extending *Beck*, has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case."  *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (*en banc*). The failure of a state trial court to instruct on lesser-included offenses or lesser-related offenses in a noncapital case does not present a federal constitutional claim.  *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *see also Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998).

Under Ninth Circuit precedent, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule."  *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)).  But the U.S. Supreme Court has never so held.  "[C]ircuit precedent does not constitute 'clearly established Federal law,

---

[4] "'Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.'  If a lesser offense shares some common elements with the greater offense, or if it arises out of the same criminal course of conduct as the greater offense, but it has one or more elements that are not elements of the greater offense as alleged, then it is a lesser related offense, not a necessarily included offense."  *People v. Hicks*, 4 Cal. 5th 203, 208–09 (2017) (citation omitted).  The California Court of Appeal's determination that accessory-after-the-fact liability is a lesser related offense is an interpretation of state law that binds this court in a federal habeas action. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Whether the offense was a lesser-related or lesser-included offense does not change the outcome here, however, because the law concerning the duty to give instructions on lesser related offenses is even more unsettled than that concerning the duty to give instructions on lesser included offenses.

United States District Court
Northern District of California

1    as determined by the Supreme Court.'" *Glebe v. Frost*, 574 U.S. 21, 24 (2014). Without such a

2    Supreme Court holding, habeas relief is unavailable.

3            Torrence's claim fails because there is no clearly established federal law from the U.S.

4    Supreme Court that a trial court must instruct on all lesser-related and lesser-included offenses.  He

5    was charged with murder and attempted murder, and the jury was instructed on those crimes as well

6    as aiding-and-abetting liability for those crimes.  He had no due process right to instructions on

7    being an accessory-after-the-fact as a lesser-related offense. The California Court of Appeal's

8    decision that the federal constitution does not require a lesser-related offense instruction was

9    consistent with *Beck v. Alabama*, 447 U.S. 625.  The California Court of Appeal's rejection of the

10   claim was not "contrary to," or "an unreasonable application of, clearly established Federal law, as

11   determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Torrence is not entitled

12   to the writ on this claim.


13

14       F.   Cumulative Error Claim

15           Finally, Torrence contends that the cumulative effect of the foregoing errors so infected the

16   trial with unfairness as to make his conviction a denial of due process.  The California Court of

17   Appeal did not discuss the cumulative error claim, but the affirmance of the conviction implicitly

18   included a rejection of the cumulative error claim that had been presented on appeal.

19           "The cumulative effect of multiple errors can violate due process even where no single error

20   rises to the level of a constitutional violation or would independently warrant reversal." *Ybarra v.*

21   *McDaniel,* 656 F.3d 984, 1001 (9th Cir. 2011) (citing *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

22   2007)).  As there are imperfections in all trials, the cumulative effect of the errors must make the

23   trial and sentencing "fundamentally unfair" to warrant habeas relief.  *Chambers v. Mississippi*, 410

24   U.S. 284, 298 (1973).

25           Here, there were two assumed constitutional errors at Torrence's trial:  (1) a Confrontation

26   Clause error in the admission of lieutenant Jones' testimony about past police contacts with Torrence

27   and Denard, and (2) a *Miranda* error in the admission of Torrence's statement to jailers that he was

28   in the 69th Village gang.  In both instances, the evidence primarily was directed at the same point,

United States District Court
Northern District of California

United States District Court
Northern District of California

i.e., that Torrence was in a gang.  But the other evidence at trial on this point was so strong that it can be said with certainty that the impact of these two constitutional errors did not accumulate to result in a fundamentally unfair trial.  As discussed in Section A.2, above, the evidence that established that Torrence was in a gang, that connected Torrence to Denard, that showed that the shooting was done for the benefit of the gang, and that Torrence was not merely an unknowing driver of a car from which a passenger unexpectedly fired shots was quite strong.  Torrence is not entitled to habeas relief under the cumulative error doctrine.

G.  <u>No Certificate of Appealability</u>

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is DENIED.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: July 29, 2020

_____
SUSAN ILLSTON
United States District Judge